MAXWELL, J.,
for the Court:
¶ 1. A jury convicted Patrick Duke of aggravated assault after he shot Howard Taper. On appeal, Duke challenges the sufficiency and weight of the evidence. As he sees it, the jury got it wrong by not buying his version that he shot Taper in self-defense. But weight and credibility issues are for jurors to decide, not appellate judges. And here, the jury sifted through the conflicting testimony and resolved it against Duke.
¶ 2. Upon review, we find the evidence — which included Duke’s admission that he shot Taper after going to the park to confront him — was sufficient to support that he committed a nonjustified aggravated assault and the verdict was not against the weight of the evidence. We thus affirm Duke’s conviction and sentence.[1]
Background Facts and Procedural History
¶ 3. On Saturday, October 29, 2011, Duke, who was twenty-five years old, shot his sixty-three-year-old neighbor, Taper, in the back of the knee with a 9mm pistol. Afterwards, Taper was hospitalized for thirteen days and had plates and pins surgically implanted in his knee. One day after the shooting, Duke voluntarily turned himself in to police. Duke also surrendered his 9mm pistol and the two guns he took from Taper’s truck after he shot him.
*404 ¶ 4. At trial, Duke claimed he shot Taper in self-defense. Other witnesses, including Taper, also testified about the shooting and events leading up to it. The jury resolved the evidence against Duke and returned a guilty verdict on the sole aggravated-assault charge. The judge sentenced Duke to fifteen years’ imprisonment, with ten years to serve and five years suspended. After an unsuccessful motion for a judgment notwithstanding the verdict or a new trial, Duke appealed.
Trial Testimony
A. The Events Leading to the Shooting
¶ 5. While the evidence is conflicting, both Taper and Duke claimed that shortly before the shooting, the two encountered each other at a stop sign in Lambert, Mississippi. Taper claims he saw Duke standing next to his white Ford Crown Victoria. Taper stopped his truck near Duke, hoping for an apology for some pri- or rift between the two. But when Duke saw Taper, he cursed at him and sped off.
¶ 6. Duke remembered the encounter quite differently. He testified that he and a friend, Andrew Butts, had their sights on barbequing when they saw Taper at a stop sign. Duke remembered Taper approaching him to talk about an earlier run-in between the two. But Duke told Taper he did not want to talk. At this point, Taper, who Duke claims was drunk, threatened to kill Duke and pulled a shotgun on him. After the threat, Duke sped off. Duke’s friend, Butts, gave similar testimony about the stop-sign encounter.
¶ 7. At trial, Taper denied threatening to kill Duke and denied pulling a shotgun on him. But he did admit that he had called Duke’s mom and asked her to talk to Duke because he had been beating people up and was worried something might happen to him.
B. The Shooting

1. Taper’s and Clyde’s Versions

¶ 8. After the stop-sign incident, Duke dropped Butts off and changed vehicles from his Crown Victoria to his black Tahoe. Duke then took to the streets, driving around in what he described as an “enraged” state because Taper had pulled a gun on him.
¶ 9. Meanwhile, Taper and his friend, Clyde Wilborn, stopped off at “the park”— a picnic-type area in Taper’s neighborhood where people gathered to drink and play horseshoes, cards, and dominos. Taper was sitting on a park bench when someone walked up behind him. He then heard Duke yell “where your gun at?” Duke then drew a pistol, and when Taper tried to stand, Duke shot him in the knee. Taper fell and Duke began whipping Taper in the face with his pistol, knocking out one of Taper’s teeth. Duke then went to Taper’s truck and took a shotgun and pistol from it before fleeing.
¶ 10. Taper’s friend Wilborn’s testimony differed some. He claimed that when Duke pulled up at the park, Taper headed for his truck. But Duke caught the older man and the two began fighting. Wilborn maintained that when he saw Duke pull a pistol, he and a few others ran. Though Wilborn claimed he did not see the shooter, he heard a lone gunshot and saw Taper on the ground with a bullet in his knee. Wilborn then watched Duke take two guns from Taper’s truck. Wilborn helped Taper up and drove him to the hospital.

2. Duke’s Version

¶ 11. As one might expect, Duke’s story also differs. While Taper claimed he made some stops before heading to the park— first to eat a sandwich and then to get a haircut — Duke testified he got to the park about five to eight minutes after the stop-sign encounter. But the timing aside, *405 Duke admitted he was mad, and the reason he stopped at the park was to confront Taper, knowing the two would fight.
¶ 12. When he got to the park, Duke pulled his Tahoe next to Taper’s truck, then walked towards Taper. Duke taunted, “you can’t get your gun now, can you[, Taper]?” After these words, Taper allegedly hit Duke in the face with a bottle and the two started brawling. Duke explained that as they were fighting, Taper was “steady running” towards his truck. Duke told Taper not to head for the truck because he knew Taper had a gun in it. Duke testified that when Taper was in arm’s reach of his truck, Duke shot Taper in the knee. Duke denied pistol-whipping Taper after he shot him.
¶ 13. After the shooting, Duke took Taper’s guns from Taper’s truck and left. Duke recalled that one of Taper’s guns was “cocked and ready to shoot.” The next day, Duke turned himself in and brought Taper’s two guns and his 9mm pistol with him to the police station. Duke had a swollen lip from the fight.
Discussion
I. Sufficiency of the Evidence
¶ 14. Duke’s first challenge is to the sufficiency of the evidence. He suggests there were too many critical contradictions to support the conviction.
¶ 15. When assessing the legal sufficiency of evidence, “we consider all evidence in the light most favorable to the State.” Grossley v. State, 127 So.3d 1143, 1147 (¶ 10) (Miss.Ct.App.2013) (citing Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss. 2005)). “Credible evidence consistent with guilt must be accepted as true.” Id. (citing McClain v. State, 625 So.2d 774, 778 (Miss.1993)). We give the State the “benefit of all favorable inferences reasonably drawn from the evidence.” Id. (citing Jones v. State, 20 So.3d 57, 64 (¶ 16) (Miss. Ct.App.2009)). The central question “is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (quoting Bush, 895 So.2d at 843 (¶ 16)).

A. Aggravated Assault

¶ 16. Generally, to prove aggravated assault, in the manner charged here, the State has to prove two elements — that the defendant (1) attempted to cause or purposely or knowingly caused bodily injury to another (2) with a deadly weapon. See Miss.Code. Ann. § 97-3-7(2)(a)(ii) (Supp.2013). But because Duke asked for and was granted a self-defense instruction,[2] the State had the additional burden of disproving self-defense beyond a reasonable doubt. Crook v. State, 105 So.3d 353, *406 360 (IT 19) (Miss.Ct.App.2012). In other words, there was a third required element — that the shooting was “not in necessary self-defense.”
¶ 17. Our review shows the jury was properly instructed on these three elements, and there was proof offered on each element. While Duke argues discrepancies in the evidence made it untrustworthy, “weighing the credibility of witnesses is the exclusive province of the jury.” Renfro v. State, 118 So.3d 560, 564 (¶ 14) (Miss.2013). And in the case of multiple witnesses, it is also the jury’s call as to which of the witnesses to believe. Id.
¶ 18. To support his claim, Duke highlights some conflicts in testimony. For example, he points to Clyde’s testimony that Taper was drunk and had been swigging Calvert whiskey from the bottle, which Taper denied. And he also mentions Taper’s denial that he had threatened Duke earlier with a shotgun, when Duke and Butts testified he had. Though these are no doubt testimonial conflicts, appellate courts typically “do not reverse criminal cases where there is a straight issue of fact, or a conflict in the faets[.]” Hales v. State, 933 So.2d 962, 968-69 (¶ 24) (Miss.2006). Conflicts like these are the very purpose for which juries are empaneled — to pass upon questions of disputed fact. Id.
¶ 19. Still, these discrepancies aside, the fact remains that after his run-in with Taper at the stop sign — whether a gun was pulled or not — Duke could have simply let it go or called the police. But he did not. Instead, he admitted he went home, changed vehicles, then drove around town in an “enraged” state before going to the park armed with a pistol, intent on confronting Taper. Then he ended up shooting Taper. This much is not in dispute.

B. Self-Defense

¶ 20. While Duke understandably hoped the jury would buy his version that Taper was running for a gun so the shooting was justified, the jury rejected his defense. Perhaps the jurors believed Taper’s version that Duke shot him without provocation. Or maybe the jury felt Duke was not in imminent danger, or simply used more force than necessary to repel his older adversary. Any of these possible findings would be objectively reasonable based on the evidence — particularly when viewed in the light most favorable to the State. But we need not speculate about the jurors’ specific reasoning, since we are satisfied there was sufficient evidence to support a nonjustified[3] aggravated-assault conviction.
II. Weight of the Evidence
¶ 21. Duke next challenges the weight of the evidence. His argument mirrors his attack on the sufficiency of the evidence— contradictions in witness testimony.
*407 ¶ 22. When considering challenges to the weight of the evidence, “we view the evidence in the light most favorable to the verdict[.]” Grossley, 127 So.3d at 1149 (¶ 19) (citing Bush, 895 So.2d at 844 (¶ 18)). To disturb a verdict on this ground, we would have to find it was contrary to the overwhelming weight of the evidence and an unconscionable injustice. Id. Our review requires we accept all evidence consistent with the defendant’s guilt as true “together with any reasonable inferences that may be drawn from the evidence.” Crook, 105 So.3d at 364 (¶33) (quoting Young v. State, 891 So.2d 813, 821 (¶ 21) (Miss.2005)). “Any factual disputes are properly resolved by the jury and do not mandate a new trial.” Id. (quoting Moore v. State, 859 So.2d 379, 385 (¶ 26) (Miss.2003)).
¶ 23. Again, we agree there were some inconsistencies in witness testimony, but these conflicts are simply not enough to warrant a new trial. Grossley, 127 So.3d at 1149 (¶ 20). Since the weight of the evidence is challenged, we must view the evidence in the light most favorable to the verdict. And considering Duke’s admission that he was driving around “enraged” before going to the park to confront and fight Taper, and Taper’s testimony that he did not provoke the shooting, we cannot say the weight of the evidence heavily preponderates against the verdict. The conflicting evidence Duke mentions was for the jury to decide as it saw fit, and the jurors decided the conflicts against Duke. Because the inferences the jury made were not unreasonable, and the verdict is not unconscionable, we affirm the conviction and sentence.
¶ 24. THE JUDGMENT OF THE QUITMAN COUNTY CIRCUIT COURT OF CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF FIF-
TEEN YEARS, WITH FIVE YEARS SUSPENDED AND TEN YEARS TO SERVE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO QUITMAN COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, FAIR AND JAMES, JJ., CONCUR.

. Duke also argues his attorney was ineffective for not communicating a plea offer to him. But he provides no evidence a plea offer was ever made. We thus dismiss Duke’s ineffective-assistance claim without prejudice. He may pursue this claim in a post-conviction relief action if he so chooses. See Read v. State, 430 So.2d 832, 837 (Miss. 1983) (where the record cannot support an ineffective-assistance-of-counsel claim on direct appeal, relief should be denied, preserving the defendant’s right to argue the same issue through a petition for post-conviction relief).

. The jury was properly instructed on self-defense. Instruction C-l 1 read:
The [c]ourt instructs the jury that to make an assault justifiable on the grounds of self-defense, the danger to [Duke] must either be actual, present and urgent, or he must have reasonable grounds to believe that [Taper] intended to do him some great bodily harm, and in addition to this he must have reasonable grounds to believe that there is imminent danger of such act being accomplished. It is for the juiy to determine the reasonableness of the grounds on which the defendant acts.
The jury was also given Instruction C-12: [0]ne who claims self-defense to his actions may not use excessive force to repel the attack, but may only use such force as is reasonably necessary under the circumstances. If you find from the evidence, beyond a reasonable doubt, that [Duke] caused bodily injury to [Taper] by shooting him and that said shooting was a use of more force than was reasonably necessary under the circumstances of this case, then the defense of self-defense would not apply to this case.

. There is some question about whether Duke was even entitled to claim self-defense. "To make assault justifiable on grounds of self-defense, danger to the defendant must be either actual, present and urgent, or defendant must have reasonable grounds to apprehend design on the part of the victim to kill, or to do him some great bodily harm, and, in addition, there must be imminent danger of such design being accomplished.” Anderson v. State, 571 So.2d 961, 963 (Miss.1990). But "if a person provokes a difficulty, arming himself in advance, and intending, if necessaty, to use his weapon and overcome his adversary, he becomes the aggressor and deprives himself of the right of self-defense." Id. (emphasis added); see also Griffin v. State, 495 So.2d 1352, 1354 (Miss. 1986) (citing Cooley v. State, 391 So.2d 614, 617 (Miss.1980)) ("[0]ne who leaves an altercation, arms himself, and returns with the intent to and does use his weapon on the other party cannot claim self-defense.”).